*In the*
# UNITED STATES COURT OF APPEALS
*for the*
# FIRST CIRCUIT

Nos. 16-1370, 16-1406

WAL-MART PUERTO RICO, INC.,

*Plaintiff-Appellee,*

− *v.* −

JUAN C. ZARAGOZA-GOMEZ, in his official capacity as Secretary of the
Treasury of the Commonwealth of Puerto Rico,

*Defendant-Appellant.*

## BRIEF FOR PLAINTIFF-APPELLEE

**APPEAL FROM THE OPINION AND ORDER AND JUDGMENT DATED
MARCH 28, 2016, GRANTING PLAINTIFF'S REQUEST FOR A
PERMANENT INJUNCTION BY THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF PUERTO RICO, NO. 3:15-cv-03018-JAF**

Neal Manne
Joseph S. Grinstein
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
nmanne@susmangodfrey.com
jgrinstein@susmangodfrey.com

Shawn Rabin
Steven M. Shepard
SUSMAN GODFREY LLP
560 Lexington Avenue, Fifteenth Floor
New York, New York 10022‑6828
Telephone: (212) 336‑8330

Facsimile: (212) 336‑8340
srabin@susmangodfrey.com
sshepard@susmangodfrey.com


Juan A. Marqués-Díaz
Francisco G. Bruno
McCONNELL VALDÉS LLC
P.O. Box 364225
San Juan, Puerto Rico 00936-4225
Telephone: (787) 250-2619/5608
Fax: (787) 759-2772/620-8325
jam@mcvpr.com
fgb@mcvpr.com

*Attorneys for Plaintiff-Appellee*

# TABLE OF CONTENTS

STATEMENT OF THE CASE ................................................................. 1

I.     Puerto Rico Enacts the "Wal-Mart Tax," Which Applies to Transfers by Interstate Companies ......................................... 3

II.    The "Wal-Mart Tax" Raises Wal-Mart's Effective Tax Rate to 114% of Its Income in Fiscal Year 2016, and to More Than 300% in Future Years ................................................... 6

III.   Wal-Mart Pays Estimated Taxes Under the "Wal-Mart Tax" ............. 7

IV.   The District Court Orders Expedited Jurisdictional Discovery, to Which Neither Party Objects .......................................... 8

V.    The Court Denies the Secretary's Request for Irrelevant Merits Discovery .................................................................. 9

VI.   The District Court Makes Detailed Factual Findings, Most of Which the Secretary Has Not Challenged in this Appeal .............. 11

     A.     Puerto Rico's Courts Have No Power to Enjoin Unconstitutional Taxes ........................................................... 11

     B.     The Refund-Request Process Would Require Wal-Mart PR to Pay a Total of $214 Million Before Obtaining a Final Judgment from the Commonwealth Courts ...................................................................... 11

     C.     The Fiscal Sustainability Act Limits Refund Payments to $3 Million Per Year ............................................................. 13

     D.     Treasury Regulations Forbid the Payment of Tax Refunds Unless Numerous Other Priorities Are Paid First ...................................................................... 14

     E.     "Credits" Are Not a Substitute for a Refund ............................ 15

         1.    The Overpayment Credit ................................................. 16

         2.    The AMT Credit ........................................................ 17

     F.     The Transfer-Based AMT Targets Interstate Commerce and Discriminates Against Imports ........................ 18

SUMMARY OF THE ARGUMENT ....................................................................19

ARGUMENT ....................................................................................................21

    I.    The District Court Had Jurisdiction Because Puerto Rican Law Does Not Provide Wal-Mart PR With a "Plain, Speedy, and Efficient" Remedy ....................................................21

        A.    Standard of Review and Waiver ...............................................21

        B.    Argument ...................................................................................22

            1.    Because the Transfer-Based Tax Is So Enormous, Denying Federal Jurisdiction Would Be to Deny Review Altogether.......................................25

            2.    Because Puerto Rico Cannot Pay a Refund, the Refund-Request Procedure Is Not Adequate.................26

            3.    Tax Credits Do Not Provide Wal-Mart PR With a "Plain, Speedy, and Efficient" Remedy.....................29

            4.    The Secretary Misreads *Rosewell*..................................33

            5.    Federal Jurisdiction Is Mandated by the U.S. Constitution...................................................................34

    II.    Comity Did Not Bar the District Court From Striking Down the Transfer-Based AMT ...................................................35

        A.    Standard of Review..................................................................35

        B.    Argument ...................................................................................35

    III.    The Transfer-Based AMT Violates the Dormant Commerce Clause, Federal Relations Act, and Equal Protection Clause ............37

        A.    Standard of Review and Waiver ...............................................37

        B.    The Transfer-Based AMT Violates the Dormant Commerce Clause ....................................................................38

            1.    On Its Face, the AMT Discriminates Against Interstate Commerce......................................................39

            2.    The AMT Discriminates in Effect ..................................39

            3.    The AMT Discriminates in its Purpose .........................45

4.    The AMT Is Not "Compensatory" ..................................47

5.    The Secretary's "Captive Market" Argument
      Fails..............................................................................48

6.    The AMT Cannot Withstand Strict Scrutiny.................49

C.    The Transfer-Based AMT Violates the Federal
      Relations Act......................................................................51

D.    The Transfer-Based AMT Violates the Equal
      Protection Clause ..............................................................51

IV.   The District Court Did Not Abuse Its Discretion by Setting
      an Expedited Discovery Schedule on the Merits and By
      Denying the Secretary's Requested Discovery ...........................53

      A.    Standard of Review and Waiver ......................................53

      B.    Argument ............................................................................54

            1.    The Expedited Merits Schedule Was Not an
                  Abuse of Discretion ..........................................54

            2.    Denying the Secretary's Irrelevant Additional
                  Merits Discovery Requests Was Not an Abuse
                  of Discretion .....................................................55

V.    Wal-Mart PR Has Standing, and the Case Is Ripe............................56

      A.    Standard of Review..............................................................56

      B.    Wal-Mart Has Standing .....................................................57

      C.    This Case is Ripe..................................................................57

CONCLUSION .............................................................................................59

# TABLE OF AUTHORITIES

## Cases

*Adams County v. Northern Pacific Railway Company*,
  115 F.2d 768 (9th Cir. 1940) .......................................................... 28, 29, 33

*All. Of Auto. Mfrs. v. Gwadosky*,
  430 F.3d 30 (1st Cir. 2005).................................................................. 38, 49

*Am. Trucking Associations, Inc. v. Scheiner*,
  483 U.S. 266 (1987) ................................................................................42

*Amerada Hess Corp. v. Dir., Div. of Taxation, New Jersey Dep't of Treasury*,
  490 U.S. 66 (1989)........................................................................... 43, 44

*Armco Inc. v. Hardesty*,
  467 U.S. 638 (1984) ...............................................................................38

*Associated Indus. of Mo. v. Lohman*,
  511 U.S. 641 (1994) ...............................................................................47

*Bacchus Imports, Ltd. v. Dias*,
  468 U.S. 263 (1984) ...............................................................................40

*Bankers Life & Cas. Co. v. Crenshaw*,
  486 U.S. 71 (1988)...................................................................................51

*Boston Stock Exchange v. State Tax Comm'n*,
  429 U.S. 318 (1977) ....................................................................... 38, 40, 49

*Braga v. Hodgson*,
  605 F.3d 58 (1st Cir. 2010).....................................................................54

*Carrier Corp. v. Perez*,
  677 F.2d 162 (1st Cir. 1982)....................................................................24

*Cent. Greyhound Lines of N. Y. v. Mealey*,
  334 U.S. 653 (1948) ...............................................................................43

*Comptroller of Treasury of Maryland v. Wynne*,
  135 S. Ct. 1787 (2015)..................................................................... 38, 42, 43

*Coors Brewing Co. v. Mendez-Torres*,
 678 F.3d 15 (1st Cir. 2012)............................................................37

*Denton v. City of Carrollton, Ga.*,
 235 F.2d 481 (5th Cir. 1956) ................................................. 25, 26

*Dows v. City of Chicago*,
 78 U.S. 108 (1870)................................................................. 27, 36

*Engquist v. Or. Dep't of Agric.*,
 553 U.S. 591 (2008) ...................................................................51

*Fair Assessment in Real Estate Ass'n, Inc. v. McNary*,
 454 U.S. 100 (1981) ............................................................. 36, 37

*Family Winemakers of California v. Jenkins*,
 592 F.3d 1 (1st Cir. 2010)................................................. passim

*Fulton Corp. v. Faulkner*,
 516 U.S. 325 (1996) ............................................................. 40, 47

*Georgia R.R. & Banking Co. v. Redwine*,
 342 U.S. 299 (1952) ....................................................... 28, 29, 33

*Great Lakes Dredge & Dock Co. v. Huffman*,
 319 U.S. 293 (1943)....................................................................36

*Guillemard-Ginorio v. Contreras-Gomez*,
 585 F.3d 508 (1st Cir. 2009)........................................................35

*Gwin, White & Prince v. Henneford*,
 305 U.S. 434 (1939) ...................................................................43

*Herbert v. Nat'l Acad. of Scis.*,
 974 F.2d 192 (D.C. Cir. 1992)......................................................54

*Levin v. Commerce Energy, Inc.*,
 560 U.S. 413 (2010) ...................................................................36

*Maine People's All. And Nat. Res. Def. Council v. Mallinckrodt, Inc.*,
 471 F.3d 277 (1st Cir. 2006)........................................................56

*Marbury v. Madison,*
    5 U.S. 137 (1803) ........................................................................ 34

*Maryland v. Louisiana,*
    451 U.S. 725 (1981) ................................................................... 40

*Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,*
    514 U.S. 175 (1995) .............................................................. 43, 44

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality,*
    511 U.S. 93 (1994) .......................................................... 38, 47, 48

*Parker v. Agosto-Alicea,*
    878 F.2d 557 (1st Cir. 1989) .............................................. 22, 23, 24

*Playboy Enterprises, Inc. v. Pub. Serv. Comm'n of Puerto Rico,*
    906 F.2d 25 (1st Cir. 1990) .............................................. 22, 37, 53

*Pleasures of San Patricio, Inc. v. Mendez-Torres,*
    596 F.3d 1 (1st Cir. 2010) ................................................... 24, 25

*Princo Corp. v. Int'l Trade Comm'n,*
    616 F.3d 1318 (Fed. Cir. 2010) .................................................. 42

*Roman Catholic Bishop of Springfield v. City of Springfield,*
    724 F.3d 78 (1st Cir. 2013) ....................................................... 57

*Rosewell v. LaSalle Nat. Bank,*
    450 U.S. 503 (1981) ........................................................... passim

*San Juan Trading Co. v. Sancho,*
    114 F.2d 969 (1st Cir. 1940) ...................................................... 51

*Stewart Dry Goods Company v. Lewis,*
    287 U.S. 9 (1932) ............................................................... passim

*Stewart Dry Goods v. Lewis,*
    294 U.S. 550 (1935) ............................................................... 27

*Stewart Dry Goods v. Lewis,*
    7 F. Supp. 438 (W.D. Ky. 1933) ................................................. 27

*Trailer Marine Transp. Corp. v. Rivera Vázquez*, 977 F.2d 1 (1st Cir. 1992).....................................................38

*United States v. Flecha-Maldonado*,
    373 F.3d 170 (1st Cir. 2004).........................................53

*United States v. Romero-Lopez*,
    695 F.3d 17 (1st Cir. 2012)......................................53, 55

*Valentin v. Hosp. Bella Vista*,
    254 F.3d 358 (1st Cir. 2001).........................................21

*Van Wagner Boston, LLC v. Davey*,
    770 F.3d 33 (1st Cir. 2014)..........................................57

*Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322*, 651 F.3d 176 (1st Cir. 2011) ......................................58, 59

*W. Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994) .............................................39, 40

*Westinghouse Elec. Corp. v. Tully*,
    466 U.S. 388 (1984) .............................................40, 48

*Williams v. Vermont*,
    472 U.S. 14 (1985)..............................................52, 53

*Wine And Spirits Retailers, Inc. v. Rhode Island*,
    481 F.3d 1 (1st Cir. 2007).........................................37

**Statutes**

13 L.P.R.A. § 30073(b)(1) ..............................................18

13 L.P.R.A. § 30202 ...................................................17

13 L.P.R.A. § 30263 ....................................................7

13 L.P.R.A. § 33022(a)(1) .............................................16

28 U.S.C. § 1341 ......................................................22

48 U.S.C. § 741a ......................................................51

48 U.S.C. § 872 ...................................................................................................22

**Rules**

Federal Rule of Civil Procedure 57 ................................................................ 9, 54

**Other Authorities**

Bittker on Regulation, *Interstate & Foreign Commerce,* "Compensatory" Taxes §
    8.06 (West 2016) ...........................................................................................47

*Brief of Appellants*, *Stewart Dry Goods*,
    Nos. 27, 28, 29 & 30, 1932 WL 33557 (filed Oct. 17, 1932) .....................27

*Henry M. Hart, Jr., The Power of Congress to Limit the Jurisdiction of Federal
    Courts: An Exercise in Dialectic*,
    66 Harv. L. Rev. 1362 (1953)............................................................... 34, 35

*Martin A. Redish & Curtis E. Woods, Congressional Power to Control the
    Jurisdiction of Lower Federal Courts: A Critical Review and A New
    Synthesis*,
    124 U. Pa. L. Rev. 45 (1975)........................................................................35

## STATEMENT OF THE CASE

Can a federal district court protect a taxpayer from a blatantly unconstitutional tax, when the local courts cannot provide any meaningful relief because of a financial crisis that the government itself describes as greater than has occurred in any jurisdiction in generations? The district court said yes, emphatically. Wal-Mart Puerto Rico ("Wal-Mart PR"), the taxpayer whose federal constitutional rights are being violated by this tax, urges this Court to agree.

This case is properly in federal court because of two separate factors: (1) the tax—dubbed the "Wal-Mart tax" by local officials—is huge beyond all precedent, and (2) no refund is available. These two factors mean that Wal-Mart PR cannot obtain a "plain, speedy, and effective" remedy in Puerto Rico's courts. Therefore, neither the Butler Act nor the comity doctrine prevents the federal courts from striking down the unconstitutional "Wal-Mart tax."

*First*, this tax is lethal. The transfer-based corporate Alternative Minimum Tax ("AMT"), is not only discriminatory (it applies only to out-of-state businesses' transfers of goods and services to their Puerto Rican subsidiaries) but also confiscatory: Wal-Mart PR owed (and has paid) approximately $30.9 million of this AMT in its last fiscal year—which was in addition to the company's "regular" income tax of $16 million. As a result, Wal-Mart PR's total income tax rose to 114% of the company's annual income. Addendum 53. In future years, Wal-Mart

PR's transfer-based AMT will rise to $40 million, and Wal-Mart PR's total tax burden will exceed 300% of its income.

*Second*, no refund is available. The Commonwealth has enacted a separate law, called the Fiscal Sustainability Act, which requires its courts to limit any payment of a tax refund to just $3 million per year. Even that $3 million may be withheld if the government, in its discretion, "finds there are no funds available" in a particular year. Addendum 64. More recently, Puerto Rico's Department of the Treasury issued Guidelines that forbid the payment of a tax refund so long as numerous other priorities have not been paid in full. The District Court found: "[I]f Wal-Mart PR had to vindicate its federal rights by means of a tax-refund action [in the Puerto Rico courts], Wal-Mart PR would have to keep paying several tens of millions of dollars in AMT to Puerto Rico, while it is virtually certain that, under present circumstances and law, Puerto Rico would not fully refund that money for decades, if at all." Addendum 67.

Both factors—the enormous tax and unavailability of a refund—are the results of Puerto Rico's unfortunate fiscal crisis. That crisis continues to worsen. As the District Court found, the "Commonwealth is insolvent and will continue to be insolvent for the foreseeable future." Addendum 75. According to the Puerto Rican Treasury's own projections, the Commonwealth's operating account "will finish June 2016 with a negative balance of almost $1 billion." Addendum 13.

2

The Secretary of the Treasury predicted that Puerto Rico will default in 2016. Addendum 75; A1449-51.

Under the unique circumstances of this case, the District Court correctly concluded that it had jurisdiction under the Butler Act, that the comity doctrine does not apply, and that the "Wal-Mart tax" is discriminatory and unlawful.

## I. Puerto Rico Enacts the "Wal-Mart Tax," Which Applies to Transfers by Interstate Companies

In April 2015, Puerto Rico's Legislature had a problem. To balance the budget, the Legislature needed to find an additional $125 million in new revenue. Addendum 27-28. The government was under "a lot of pressure [to] raise revenue fast," according to the Secretary of the Treasury, Defendant-Appellant Juan Zaragoza. Addendum 28; Appendix 1472 (hereinafter "A").

To raise the necessary revenue, the Legislature asked the Treasury to recommend increases to the transfer-based AMT. This AMT—which is ably described by the District Court, at Addendum pages 25-27—calculates a corporate taxpayer's "tentative minimum tax" as the sum of: (a) a percentage (6.5%, in Wal-Mart PR's case) of the gross value of tangible property transferred to the taxpayer by affiliates located outside Puerto Rico; plus (b) 20% of the gross value of services performed for the Puerto Rican taxpayer by affiliates located outside Puerto Rico. *See id.* 26-27; *see also id.* 111 (text of transfer-based AMT, as amended). If this sum (called the "tentative minimum tax") exceeds the taxpayer's "regular" income

3

tax, then the taxpayer must pay the "tentative minimum tax."  In that case, the difference between the "tentative minimum tax" and the "regular" tax is defined as the AMT.

By increasing the transfer-based AMT, the Legislature acted contrary to the Secretary's own advice.  He personally had urged the Legislature to *reduce* this tax, not increase it.  Addendum 28-29; A1420.  The Legislature rejected the Secretary's advice and asked the Treasury to "prepare some estimates" of the "amount of money that could be raised by taxing the gross value of related party transfers from off the island."  A1424 (testimony of Secretary); *see also* Addendum 29.

To comply with the Legislature's request, the Treasury Department looked at the most recent tax returns of "multinational chains."  Addendum 29; A1424-25.  Based on those returns, Treasury recommended new brackets for the transfer-based AMT's rate on property transfers.

The "threshold for the top bracket," the District Court found, "was specifically designed to capture Wal-Mart PR."  Addendum 32.  In the Secretary's own words, the "top tax rate under the tangible property component of [the AMT] is a Wal-Mart tax only."  *Id.* 31.  Wal-Mart PR's AMT payment constitutes one fifth of the total amount collected under the amended AMT.  *Id.* 31.  In meetings with Wal-Mart representatives, senior government officials referred to the amendments to the AMT as "the Wal-Mart tax."  *Id.* 32.

4

As an additional revenue-raising measure, the Treasury recommended that the Legislature eliminate the Secretary's authority to grant exemptions to the transfer-based AMT. Previously, the Secretary could (and did) grant "waivers" to taxpayers who submitted proof that their transfer prices were appropriate. *Id.* 33; *see also* A1441. This authority was eliminated in order to "raise as much money as possible." *Id.* Raising revenue required "extract[ing] the tax . . . [n]o matter how clear it is that the [taxpayer's] transfer pricing is appropriate." Addendum 33.

In his brief, the Secretary's lawyers now argue that the amendments to the transfer-based AMT were needed to prevent taxpayers from "shifting profits" out of Puerto Rico by manipulating transfer prices. *See generally* Addendum 22-23 (describing, in theory, how a taxpayer might do this). But the District Court found—based on the Secretary's own testimony at trial—that the amendments "do[] not address the issue of transfer-pricing in 'any adequate or appropriate way' because the tax 'does not actually seek to identify transfer pricing problems.'" *Id.* As the Secretary testified, a more targeted law, designed to prevent transfer-pricing manipulation, "would not have yielded 125 million bucks in 11 months, as we needed." Addendum 34.

As for Wal-Mart PR, the Treasury Department did not "suspect Wal-Mart PR of shifting any of its income off of the island." Addendum 35. "[W]hen asked at the hearing, Secretary Zaragoza candidly admitted that Puerto Rico's Treasury

has 'no reason to believe that [Wal-Mart PR and Wal-Mart Stores] have been using any . . . base erosion techniques' or abusive profit shifting."  Addendum 43.

The amendments to the transfer-based AMT were passed with no hearings and little debate.  They were signed into law, as part of "Act 72 of 2015," on May 29, 2015 (eleven days after they were introduced) and became effective immediately.  Addendum 32.

## II. The "Wal-Mart Tax" Raises Wal-Mart's Effective Tax Rate to 114% of Its Income in Fiscal Year 2016, and to More Than 300% in Future Years

Wal-Mart PR is a Puerto Rico corporation that pays Puerto Rico income tax; it does not pay U.S. federal or state income tax.  Addendum 34-35.  Wal-Mart PR purchases approximately $700 million of inventory from its parent company, Wal-Mart Stores, Inc., which is located (and taxed) in the United States.  *Id.*  Wal-Mart PR also buys approximately $1.6 billion of goods annually from local suppliers in Puerto Rico.  *Id.*  Wal-Mart PR's annual taxable income has varied, over the last five years, between $19 million and $66 million.  Supplemental Appendix 0626 (hereinafter "SA").

Because the transfer-based AMT is a tax on transfers of goods and services to the taxpayer, and not a tax on the taxpayer's income, the AMT can easily "result in a tax that is in excess of the taxpayer's profits."  Addendum 40.  As the District Court found, that is "precisely what is happening to Wal-Mart PR."  *Id.*

6

As a result of the "Wal-Mart tax," Wal-Mart PR's total income tax for its last fiscal year (which ended on January 31, 2016[1]) was approximately $47.0 million.  Addendum 35, 39-40.  Two thirds of that tax ($30.9 million) was the transfer-based AMT.   The company's income, however, was just $41 million, meaning that its $47 million tax bill resulted in an effective tax rate of 114%.  *Id.* 40-41.  In future years, Wal-Mart PR's transfer-based AMT will increase to $40 million, which will cause the company's effective income tax rate to soar above 300%. *Id.* 41.

## III.    Wal-Mart PR Pays Estimated Taxes Under the "Wal-Mart Tax"

Wal-Mart PR, like many other Puerto Rican taxpayers, is required to pay estimated income tax each quarter.  13 L.P.R.A. § 30263.  As the Secretary has stipulated, Wal-Mart PR made estimated payments during its last fiscal year, which ended on January 31, 2016.  A751, ¶4(1).  These payments totaled $45 million. A909-10 (testimony of Wal-Mart PR's Senior Tax Manager, Antonio Echevarria). These estimated tax payments included the transfer-based AMT.  *Id.*  On January 15, 2016, Wal-Mart made its final payment of estimated tax for the fiscal year that ended on January 31, 2016.  That payment was approximately $13 million.  A904-

---

[1] Wal‑Mart PR's fiscal year ends on January 31.  The company refers to its fiscal years by their ending dates.  Thus, "Fiscal Year 2016" (abbreviated FY16) refers to the twelve months ending on January 31, 2016—even though eleven of those months were in *calendar year* 2015.

7

05.  The District Court found that estimated tax payments are "treated as payment on account of the tax for the taxable year."  Addendum 50 n.1.  If Wal-Mart PR were to make insufficient estimated payments, it would incur a penalty.  *Id.*

## IV.   The District Court Orders Expedited Jurisdictional Discovery, to Which Neither Party Objects

Wal-Mart PR filed suit on December 4, 2015.  The parties discussed a discovery schedule at the preliminary conference held on December 23, 2015.  All agreed that the question of jurisdiction should be resolved quickly.  Addendum 68 n.22.  The Secretary asked the District Court to rule based on the pleadings alone, without hearing evidence, but the court denied that request: "I cannot responsibly determine whether there is any exception to the Butler Act unless I have the evidence.  I can't."  A125.

The Court asked both parties what discovery they needed regarding jurisdiction.  *See* A135-37 (Secretary's response).  The District Court then requested additional discovery, including Wal-Mart PR's "financial statements, tax information of Wal-Mart USA, transactions between the parent company and subsidiaries, deposition of accounting official(s) in charge of tax transactions." SA0001 (Minute Order); *see* A144-46 (transcript).

On January 4, 2016, the parties filed a Joint Discovery Plan.  A207.  In Wal-Mart PR's portion of this plan, the company agreed to depositions of its external

auditor, its CFO, and a Wal-Mart Stores employee with knowledge of transfer prices.  A208.

On January 7, 2016, the District Court entered a discovery order that permitted the Secretary to take jurisdictional discovery of Wal-Mart PR.  This order directed Wal-Mart PR to provide "sufficient background information," including its corporate structure, economic and market analyses, the volume and nature of the company's transactions with its parent, and its projected revenues, profits, and taxes over the next six years.  A319.

The Secretary never moved to compel discovery from Wal-Mart PR.  *See* A1520.  In this appeal, the Secretary does not dispute that Wal-Mart PR provided the discovery ordered by the District Court and agreed to in the Joint Discovery Plan.  *See* SA0001 (Minute Order); A208 (Joint Discovery Plan); A319 (January 7 order).

## V.  The Court Denies the Secretary's Request for Irrelevant Merits Discovery

On December 30, the District Court expanded the scope of the evidentiary hearing to include the merits.  A169.  The Court explained:  "[I]f jurisdiction exists, the parties not only desire, but deserve, a prompt resolution . . . . an action seeking declaratory and injunctive relief mandates expedition."  A168 (citing Federal Rule of Civil Procedure 57).

On January 4, in his portion of the Joint Discovery Plan, the Secretary sought intrusive merits discovery into Wal-Mart PR's and Wal-Mart Stores' internal financial and accounting practices. A219-223. The Secretary did not seek any discovery relating to the purpose of the amended tax or to the tax's effect on other taxpayers. *See id.* The Secretary also argued that the time allowed for merits discovery was too short. *See* Addendum 68 n.22; A321 (January 7 Motion).

The District Court denied the Secretary's merits discovery requests: "[M]ost of the Commonwealth's requests [in the Joint Plan] are irrelevant to the issues in this case. The Commonwealth's requests appear geared towards a tax audit of Wal-Mart PR, as opposed to a defense of the legality of the Commonwealth's challenged tax laws." A318 (January 7 order); *see also* A340 (January 8 order).

In its final Opinion and Order, the District Court again explained its reasons for not granting additional merits discovery: "Few, if any, facts about Wal-Mart were relevant to the legality of the AMT. And, most of the materials that the Secretary needed to uphold the law should have already been in his hands. So, we denied counsel's request [for more time] on the ground that we would 'not delay the proceedings in this pressing matter for no reason.' If counsel had asked for more time to pursue further discovery for purposes of the jurisdictional inquiry, our response might have been different." Addendum 68 n.22 (quoting A343).

10

## VI. The District Court Makes Detailed Factual Findings, Most of Which the Secretary Has Not Challenged in this Appeal

Beginning on February 2, the District Court held a four-day evidentiary hearing. Wal-Mart PR presented twelve witnesses; the Secretary presented two. The District Court made detailed findings of fact based on the evidence. In his Opening Brief, the Secretary does not claim any of these findings were erroneous, with the exception of one finding regarding the "overpayment credit."

### A. Puerto Rico's Courts Have No Power to Enjoin Unconstitutional Taxes

The District Court found that Wal-Mart PR would be unable, under Puerto Rican law, to obtain an injunction from Puerto Rico's courts. Addendum 51 n.15; *id.* 57-58. A taxpayer's only remedy under Puerto Rican law is to pay the tax, request a refund from the Treasury, and then, when the refund is eventually denied, sue in Puerto Rican trial court. Preliminary injunctions are unavailable. *Id.* "[T]he taxpayer must keep paying the tax" until the judgment becomes final, which the District Court found would only occur once the Puerto Rico Supreme Court decided the case. *Id.*

### B. The Refund-Request Process Would Require Wal-Mart PR to Pay a Total of $214 Million Before Obtaining a Final Judgment from the Commonwealth Courts

The District Court found that Wal-Mart PR "will be liable for at least $40 million in AMT each year—up from the approximately $30 million it paid this past year." Addendum 56; *see also id.* 41 ("credit[ing]" Wal-Mart PR's projected

future revenue, income, and tax liability); SA0626 (chart summarizing future projections).

The District Court further found: "[I]f Wal-Mart PR had to pursue a tax-refund action," then "it would have to wait a minimum of 2.4 years and an average of 4.6 years before the AMT is finally overturned as unconstitutional." Addendum 61. The District Court calculated the 4.6 year wait time by adding together (1) a one-year wait (for the Treasury to deny the refund request) plus (2) an additional 3.6-year wait (for Puerto Rico's courts to adjudicate the appeal). Addendum 61. Both estimates were likely too low, the District Court found.[2]

Even assuming the Puerto Rican tax-refund request process lasted only 4.6 years, Wal-Mart PR would be required to pay an additional $184 million in unconstitutional AMT during that time,[3] on top of the $30 million the company already paid in its last fiscal year. By the time Puerto Rico's Supreme Court finally struck down the tax, Wal-Mart PR would be owed a $214 million refund.[4]

---

[2] A one-year wait for Treasury to deny the refund would depend on the "unrealistic" and "improbable" assumption that Treasury would not first conduct an audit. Addendum 61, 63. And the 3.6 year wait for the Puerto Rican courts, which a Wal-Mart PR summary witness estimated based on a survey of recent cases, was also unduly optimistic. In the District Judge's 30-year experience, "it would take far longer than 3.6 years to obtain a remedy in the Puerto Rico Supreme Court." *Id.* 61.

[3] 4.6 years (*see* Addendum 61), multiplied by $40 million in AMT per year (*see* Addendum 56) equals $184 million.

[4] $30 million was due for the fiscal year ending January 31, 2016, and $184 million would come due during the 4.6 year wait for the refund-request process. Added

Meanwhile, Wal-Mart PR's annual income would hover between $10 million and $16.6 million, for a total of just $72 million over the next five years. *See* SA0626.[5]

The District Court also described an "unrealistic" best-case scenario—a scenario that was "contrary to local law" because it depended on the Puerto Rican trial court enjoining the tax, which that court lacks authority to do. Addendum 63. Even under this unrealistic "best case scenario," the District Court found, Wal-Mart PR would still pay $70 million in unconstitutional AMT. Addendum 63-64.

### C. The Fiscal Sustainability Act Limits Refund Payments to $3 Million Per Year

The District Court found that Puerto Rico's Special Fiscal and Operational Sustainability Act of 2014 (the "Fiscal Sustainability Act") would limit the payment of a tax refund, to Wal-Mart PR, to just $3 million per year. Addendum 64. At a rate of $3 million per year, it would take more than 71 years to refund $214 million (without accounting for interest).

Even the payment of $3 million is uncertain, however, because the Fiscal Sustainability Act allows the Commonwealth to unilaterally "postpone" payment if

---

together, those amounts total $214 million of transfer-based AMT. The District Court's estimates do not include interest; if included, interest would significantly increase this amount. *See* Opening Br. 27 n.7 (6% interest rate).

[5] These amounts are shown in the row labeled "Income before income tax." The sum of these amounts, for the five years beginning in FY17, is $71.88 million. *See* A985-86 (describing this chart); Addendum 41 (District Court credits these projections).

the government determines that there are "no funds available to honor the payment plan" that year. Addendum 62, 64. Because Puerto Rico in reality "will stay insolvent for the foreseeable future," the District Court found, "its payments toward Wal-Mart PR's tax refund would likely be 'postponed' indefinitely" under the Fiscal Sustainability Act. *Id.* 64.

Even assuming "the best-case scenario for the best-case scenario"—a scenario in which the Commonwealth trial court enjoins the tax after only $70 million is paid (which it lacks legal authority to do), and in which the Treasury has $3 million "funds available" for refund each year (which it does not have)—even then, "the Commonwealth would take twenty-four years to satisfy a $70 million judgment." Addendum 64.

### D. *Treasury Regulations Forbid the Payment of Tax Refunds Unless Numerous Other Priorities Are Paid First*

In addition to the Fiscal Sustainability Act's $3 million annual limit, Treasury Guidelines forbid any payment of a tax refund, unless other, higher priorities already have been paid in full. Addendum 8, 64, 75; SA0401 (Guidelines).

The Guidelines establish at least four levels of payment priorities that are higher than a tax refund, including service on public debt, payments for "essential services" like "public health," and pensions. SA0402-03. These Guidelines "do

not bestow any priority to the payment of tax refunds, whether court ordered or not." Addendum 8, *see also id.* 64.

The Treasury currently lacks the money to pay the higher obligations that have a higher priority than tax refunds. Addendum 9. The Commonwealth is "insolvent" and, the District Court found, will remain insolvent "for the foreseeable future." Addendum 64. "Absent a miracle, the bank balance of the Treasury Single Account will plummet to negative $923 million in June 2016."[6] Addendum 13. The Treasury itself recently concluded "that 'significant doubt' exists about 'the Commonwealth's ability to continue as a going concern.'" Addendum 19. Wal-Mart PR's expert witness on Puerto Rico's insolvency, Martha Kopacz, testified that "the situation down here is unprecedented." Addendum 19.

### E.    *"Credits" Are Not a Substitute for a Refund*

The District Court considered two different types of tax credits that, the Secretary argued, could substitute for a refund. The District Court found that the Fiscal Sustainability Act would take precedence over both credits, and would prohibit the Treasury from granting the credits in any amount greater than $3 million per year. Addendum 66-67. The Secretary has not challenged this finding.

---

[6] The Treasury Single Account "serves as the general fisc and principal operating account for Puerto Rico." Addendum 10.

In addition, the District Court also examined the statutory text of both credits, and determined that, even without the Fiscal Sustainability Act, these credits would not provide relief to Wal-Mart PR.

### 1. The Overpayment Credit

The credit provided by 13 L.P.R.A. § 33022(a)(1) applies to "overpayments" of taxes. The District Court found that this credit does not apply to the situation where the tax is actually due when paid, but the tax in question is later determined to be unconstitutional. Addendum 65. Such a payment is not "in excess of" the amount required by the statute, and therefore cannot be the basis for a credit under Section 33022(a)(1). *Id.* The Secretary has not challenged this finding or pointed to any contrary authority or practice.

Even if the "overpayment" credit were available for payments of unconstitutional taxes, the District Court further found that this credit would only be available for one year: It could only be applied against whatever income tax would be "then enforceable" against Wal-Mart PR at the time Wal-Mart PR prevails in Puerto Rico's Supreme Court. Therefore, at best, the "overpayment" credit would entitle Wal-Mart PR to avoid only one year's future income taxes—approximately $7 million.[7] Addendum 66.

---

[7] In future years, Wal-Mart PR projects its regular (non-AMT) income tax liability will fall to approximately $7 million per year. SA0626.

The Secretary contests this finding on appeal, claiming that the overpayment credit would be available in more than one tax year. However, he cannot show that the District Court committed clear error. *See infra* 32-33. More important, even if the overpayment credit were available in more than one year, by the time Wal-Mart PR actually received a ruling entitling it to this credit, the company would have paid out an additional $184 million in taxes against just $72 million in income. *Supra* 12-13. At a rate of $7 million per year, it would take more than thirty years of "overpayment" credits to refund the total $214 million (even if the Fiscal Sustainability Act did not bar credits in excess of $3 million, which the District Court found it does, a finding the Secretary does not challenge).

### 2. The AMT Credit

The District Court also found that the AMT Credit, provided by 13 L.P.R.A. § 30202, would not provide an adequate remedy. Addendum 66; A594 (official translation of Section 30202). The AMT Credit is only available if, in a future tax year, Wal-Mart PR's "regular" income tax once again exceeds all measures of the company's "tentative minimum tax," such that no AMT is due. If that were to occur, then Wal-Mart PR could claim an AMT Credit equal to 25% of the difference between the company's regular income tax and its "tentative minimum tax" in that year.

The District Court found that the AMT Credit would not provide a meaningful remedy because it would only provide a small amount of credit in any given year. *See* Addendum 67.[8] Furthermore, the credit would be unavailable in any future year in which Wal-Mart PR again owes any kind of AMT. *Id.* It is therefore highly uncertain that this credit would remain available during the decades required to obtain a full refund. *Id.* The Secretary does not challenge these factual findings (or the finding that the Fiscal Sustainability Act would bar any use of the AMT credit in excess of $3 million per year).

### F.  The Transfer-Based AMT Targets Interstate Commerce and Discriminates Against Imports

The District Court found that the transfer-based AMT is "effectively limited" to "transactions involving interstate commerce."  Addendum 27.  The

---

[8] The District Court clearly erred in asserting (without explanation or citation) that the AMT Credit could be as high as "six or so million dollars at a time" in the future.  Addendum 67.  In Wal-Mart PR's last typical tax year, its traditional measure of "tentative minimum tax" was $13.4 million, and its regular income tax was $18.6 million.  *See* SA0023 (Pl.'s Resp. Mot. Dismiss 16 & n.9 (describing this calculation)); A1911 (tax return for FY2013).  The difference was $5.2 million.  Therefore, if the AMT Credit had been available to it then, Wal-Mart PR could have claimed only 25% of $5.2 million, that is, $1.3 million.  The $6 million AMT Credit asserted by the District Court would only be available if: (1) Wal-Mart PR were to earn such a high income that it owed $24 million in regular income tax (which is more than *three times* what is projected, *see* SA0626); *and also* (2) the Legislature were to repeal the traditional measure of "tentative minimum tax."  (In addition to the transfer-based AMT, Puerto Rico also uses a traditional AMT, with its own measure of "tentative minimum tax."  The traditional AMT is codified at 13 L.P.R.A. § 30073(b)(1), and is not at issue in this case.  *See* Addendum 25-26.)  Only if Wal-Mart PR's future regular income tax skyrocketed to $24 million, and the traditional tentative minimum tax plummeted to zero, would a $6 million AMT Credit become possible.  (Twenty-five percent of $24 million is $6 million.)

18

court based that finding both on the plain text of the statute, and on the Secretary's briefing below, which conceded that the transfer-based AMT applies "only" to transactions with affiliated corporations located outside Puerto Rico, i.e., only to "arrangements between Puerto Rico taxpayers and their cross-border affiliates." *Id.*

At the evidentiary hearing, the Secretary conceded that the tax treats "some goods sold from outside Puerto Rico differently than goods sold within Puerto Rico," and that the tax "treats articles manufactured in Puerto Rico differently than it treats some articles manufactured off the island." Addendum 27.

The District Court credited Professor Richard Pomp, who wrote: "In my nearly forty years in the field [of state taxation], rarely have I seen a statute that is as facially discriminatory as the [AMT]." Addendum 85.

## SUMMARY OF THE ARGUMENT

The District Court's voluminous factual findings, almost none of which are challenged by the Secretary, demonstrate that this case is extraordinary and unprecedented.

Two unique factors make federal jurisdiction appropriate. *First*, the transfer-based AMT imposes a lethal burden on Wal-Mart PR. It will exact more than $30 million per year for the foreseeable future, which will raise the total tax burden to much more than 100% of Wal-Mart PR's annual income. That burden is so onerous that Wal-Mart PR cannot be expected to remain in business while

pursuing a tax refund. *Second*, no tax refund is available for the foreseeable future. Even in the very best case scenario, it would take decades for Wal-Mart PR to receive a full refund.

Comity is no bar to federal jurisdiction where, as here, the local courts do not provide an adequate remedy. The Secretary points to no case in which a federal court has abandoned a taxpayer without an adequate remedy, on the grounds of comity. The Secretary's reading of the comity doctrine is contrary to numerous Supreme Court comity decisions.

On the merits, the Secretary conceded at trial that the transfer-based AMT (as amended by Act 72) discriminates against interstate transfers, discriminates against imports, and is intended for just one purpose: to raise revenue by targeting the interstate transfers of multinational corporations, especially Wal-Mart Stores and Wal-Mart PR, whom the Secretary concedes have done nothing wrong. Nothing written now by his appellate lawyers can erase the Secretary's own stark admissions on the witness stand.

The District Court did not abuse its discretion in expediting merits discovery and denying the Secretary's additional discovery requests. The Secretary received appropriate discovery. The requests that were denied were not relevant to the merits of this facial constitutional challenge.

Wal-Mart PR has standing, and its claims are ripe. Wal-Mart PR has already paid tens of millions of dollars of estimated tax as a direct result of the transfer-based AMT, and absent an injunction it would have been required to pay tens of millions more (at least) or go out of business. The issues in this case are fit for judicial review now, without the need for Wal-Mart PR to file a tax return, because the precise amount of transfer-based AMT that Wal-Mart PR owes is not relevant. Wal-Mart PR already has paid millions, it will owe millions, and *any* amount of transfer-based AMT would violate the Constitution and the Federal Relations Act.

## **ARGUMENT**

**I.    The District Court Had Jurisdiction Because Puerto Rican Law Does Not Provide Wal-Mart PR With a "Plain, Speedy, and Efficient" Remedy**

### *A.    Standard of Review and Waiver*

Because the District Court heard evidence on the jurisdictional facts, this Court reviews the District Court's findings for clear error. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 365 (1st Cir. 2001). Under this standard, this Court "must accept the court's findings and the conclusions drawn therefrom unless the whole of the record leaves [this Court] with 'a strong, unyielding belief that a mistake has been made.'" *Id.* "[O]nce the [district] court has found the facts, its ultimate legal conclusion [as to jurisdiction] is subject to de novo review." *Id.*

Here, the Secretary only claims that one of the District Court's myriad factual findings relating to jurisdiction was clearly erroneous. *See* Opening Brief

22-32; *infra* 31-32 (discussing the overpayment credit). Any challenge to the District Court's other findings has been waived. *Playboy Enterprises, Inc. v. Pub. Serv. Comm'n of Puerto Rico*, 906 F.2d 25, 40 (1st Cir. 1990).

    B.    Argument

Federal jurisdiction exists because Puerto Rico's remedy is not "plain, speedy, and efficient." *Parker v. Agosto-Alicea*, 878 F.2d 557, 559 (1st Cir. 1989). That standard is set forth in the Tax Injunction Act, which applies to state taxes. 28 U.S.C. § 1341. The Secretary concedes (and this Court has repeatedly held) that the Butler Act, 48 U.S.C. § 872, is to be construed in the same manner as the Tax Injunction Act. Opening Br. 23-24.

The only local remedy available to Wal-Mart PR is the Puerto Rican refund-request process. (The Secretary has abandoned his argument that Wal-Mart PR could obtain an injunction from Puerto Rico's courts.) The refund-request process would require Wal-Mart PR to do the following:

(1) continue to pay the transfer-based AMT;

(2) request a refund from the Secretary upon filing each year's tax return;

(3) wait while the Secretary audits the return, *see* Addendum 53;

(4) after the Secretary denies each refund request, file a lawsuit in Puerto Rico's Court of First Instance;

22

(5) appeal (or defend against the appeal) of the Court of First Instance's decision;

(6) obtain a final judgment from Puerto Rico's Supreme Court holding the tax unconstitutional. (The District Court found that Wal-Mart PR would be required to continue paying the AMT until the Puerto Rico Supreme Court enters judgment. Addendum 57.)

To complete this six-step process would take at least 4.6 years, during which time Wal-Mart PR would pay $214 million in unconstitutional tax, while earning just $72 million of income. *Supra* 12-13.

Wal-Mart PR's $214 million would be refunded at a maximum rate of just $3 million per year under the Fiscal Sustainability Act. *Id.* However, because Puerto Rico will be insolvent for the foreseeable future, even a $3 million annual payment would not be available. *Id.* Even in the very best-case scenario, the Fiscal Sustainability Act would limit Wal-Mart PR's refund to just $3 million per year, meaning the company would be required to wait for decades before obtaining a full refund of the unconstitutional tax. *Id.*

Because the tax is so enormous, and because no refund is actually available under the current and foreseeable financial situation, this Court's Butler Act precedents do not apply. Those precedents did not involve taxes that would put the taxpayer out of business, or the likelihood that Puerto Rico would be unable to pay

a refund when due. *Pleasures of San Patricio, Inc. v. Mendez-Torres*, 596 F.3d 1 (1st Cir. 2010) ($6.15 excise tax on shipments of "little cigars"); *Parker*, 878 F.2d 557 (federal employees' cost-of-living salary adjustments); *Carrier Corp. v. Perez*, 677 F.2d 162 (1st Cir. 1982) (ten-percent increase in excise tax on electronic goods).

The Secretary suggests that by affirming jurisdiction, this Court would "open the floodgates for Commonwealth tax cases." Opening Br. 52. The Secretary's scare tactic is baseless. Though uniquely positioned to have knowledge of other taxpayers' circumstances, the Secretary has not identified a single other taxpayer with a tax burden as crushing as the one on Wal-Mart PR, and has not identified a single other taxpayer whose refund would be constrained by the Fiscal Sustainability Act's $3 million annual limit. The District Court found that the highest corporate tax refund paid by the Treasury paid in the last five years was just $1,241,467; the median was $10,482. Addendum 59.

Jurisdiction is appropriate here because of the uniquely enormous tax imposed on Wal-Mart PR, which vastly exceeds the Commonwealth's ability to pay a refund, now or in the foreseeable future. These are not facts that will "open the floodgates."

1.    <u>Because the Transfer-Based Tax Is So Enormous, Denying Federal Jurisdiction Would Be to Deny Review Altogether</u>

Puerto Rico's transfer-based AMT, as currently applied to Wal-Mart PR, is analogous to the anti-union tax considered by the Fifth Circuit in *Denton v. City of Carrollton, Ga.*, 235 F.2d 481 (5th Cir. 1956), a decision that this Court cited favorably in its most recent opinion construing the Butler Act. *See Pleasures of San Patricio,* 596 F.3d at 9 n.5. In *Denton*, the city enacted a tax requiring labor organizers to pay a $1,000 "license" fee, followed by an additional $100 daily tax. The Fifth Circuit held that this tax was so "exorbitant and punitive" that "[t]o require the payment of any such sum . . . presents such a heavy burden that to decline equitable relief would be to deny judicial review altogether." *Id.*

Here, Wal-Mart PR faces an enormous tax that last year confiscated 114% of its income and would, unless enjoined, confiscate over 300% of its income for the foreseeable future. Requiring Wal-Mart PR to pay such a tax for more than four years, in order to obtain judicial review, would "be to deny judicial review altogether." *Id.*

Anthony Walker, a Vice President of Wal-Mart Stores, testified about what would occur if the District Court were to decline jurisdiction:

> [W]e want to continue to be viable. We want to continue to be a part of the solution.

> But with that said, it's untenable for us to continue to operate when we make a dollar of profit and we have to turn around and pay the government in the most recent year a dollar and 14 cents.
>
> So let me say that again. We make one dollar in profit and then for the right to do business in Puerto Rico, I have to turn around and hand the Commonwealth a dollar and 14 cents. So, you know, that is not sustainable.
>
> . . .
>
> Retail margins are razor thin. We don't make much on each transaction. We do a lot of transactions, but make a very small profit. And if you overlay Act 72 on top of the already tough environment, we find ourselves in a place that is untenable. We won't be able to continue to operate in a fashion that would force us to pay more than a hundred percent of our income. It wouldn't make sense.

A1110-11.  The District Court found that Wal-Mart PR would be "economically irrational" to continue operating in Puerto Rico while paying the transfer-based AMT.  Addendum 43.  The District Court concluded, therefore, that the transfer-based AMT "threaten[s] Wal-Mart PR's very ability to continue operating." Addendum 81.

### 2.    Because Puerto Rico Cannot Pay a Refund, the Refund-Request Procedure Is Not Adequate

Here, as in *Denton*, the confiscatory and exorbitant tax is accompanied by a virtual certainty that no refund will be paid.  *See Denton,* 235 F.2d at 485 & n.6 ("actual doubt exists concerning the recoverability of" a refund).

In addition to *Denton*, three other cases indicate that federal jurisdiction is appropriate where, as here, the government is incapable of paying a refund.  In *Stewart Dry Goods Company v. Lewis*, 287 U.S. 9 (1932) (per curiam) the

26

Supreme Court vacated the district court's dismissal of four large retailers' complaint against Kentucky's gross-revenues tax. The Court remanded for further fact-finding to determine whether Kentucky's refund-request remedy was adequate. *Id.* at 11. The Supreme Court did so even though the tax at issue was apparently less burdensome than the tax Wal-Mart PR faces here.[9]

*Stewart Dry Goods* is particularly relevant because Puerto Rico's refund-request procedure is even more deficient than Kentucky's procedure. The Kentucky Treasurer, through informal procedures, had "ke[pt] himself in financial position to refund all taxes which are paid under legal protest." *Stewart Dry Goods v. Lewis*, 7 F. Supp. 438, 440 (W.D. Ky. 1933). Nevertheless, the district court found Kentucky's procedures inadequate, and, on a second appeal, the Supreme Court accepted without question that federal jurisdiction was appropriate. *Stewart Dry Goods v. Lewis*, 294 U.S. 550 (1935) (striking down the tax).

*Stewart Dry Goods* pre-dates the Tax Injunction Act. The Secretary suggests the decision thus "provide[s] no authority" here. Opening Br. 30 n.10. That is incorrect. The standard applied in *Stewart Dry Goods* was whether the "plaintiffs had an adequate remedy at law" in the Kentucky courts. 287 U.S. at 10; *see also Dows v. City of Chicago*, 78 U.S. 108, 110 (1870) (federal equity

---

[9] According to the taxpayers, Kentucky's tax was large enough to "seriously embarrass [them] in the operation of their business," but not so large as to "render them insolvent." Brief for Appellants, *Stewart Dry Goods*, Nos. 27, 28, 29 & 30, 1932 WL 33557, at *6, *39 (filed Oct. 17, 1932).

jurisdiction appropriate where the taxpayer "has no adequate remedy by the ordinary processes of the law").  The *Stewart Dry Goods'* "adequate remedy" standard is very close to the "plain, speedy, and efficient" standard established by the Tax Injunction Act.  That is why the Supreme Court has indicated that "prior federal equity cases," like *Stewart Dry Goods*, "may . . . be instructive on whether a state remedy is 'plain, speedy and efficient'" under the Tax Injunction Act.  *Rosewell v. LaSalle Nat. Bank*, 450 U.S. 503, 525 n.33 (1981).  And that is why, in a second refund-request case, the Supreme Court applied the Tax Injunction Act to reach the same result as in *Stewart Dry Goods*, albeit under different facts.  *See Georgia R.R. & Banking Co. v. Redwine*, 342 U.S. 299, 303 (1952) (a "suit for refund after payment" was not a plain, speedy and efficient remedy under the Tax Injunction Act, because that refund procedure was "applicable only to . . . less than 15% of the total taxes in controversy").  The point, both before and after the Tax Injunction Act, is straightforward:  In order for a local refund-request procedure to deprive a taxpayer of a federal forum for his federal claims, the local government must be capable of actually paying the refund if ordered to do so.

A third case is *Adams County v. Northern Pacific Railway Company*, 115 F.2d 768 (9th Cir. 1940).  In *Adams County,* the Ninth Circuit held that the "effect of the [local] statutory refund action is rendered doubtful and therefore inadequate" to oust federal jurisdiction because "some of the defendant counties are insolvent"

and thus judgment for the taxpayer would "result only in the issuance of uncollectible warrants." *Id.* The Secretary claims that *Adams County* pre-dated the Tax Injunction Act and therefore "provides no authority" here. Opening Br. 30 n.10. The Secretary is wrong. *Adams County* was a Tax Injunction Act case. *See* 115 F.2d at 774 (quoting and applying the TIA).

Under the standard set by *Stewart Dry Goods*, *Georgia Railroad*, and *Adams County*, Wal-Mart PR has demonstrated that federal jurisdiction is appropriate because the availability of a refund, from Puerto Rico, is more than "doubtful." *Adams County*, 115 F.2d at 776.

A finding that Wal-Mart PR satisfies the *Stewart Dry Goods/Adams County* rule will not open the floodgates to federal court tax litigation in other states. In the words of Government Development Bank President Melba Acosta Febo, "Puerto Rico faces an economic and liquidity crisis beyond what any jurisdiction in the United States has faced in generations." Addendum 80-81. Wherever the line may be drawn between a jurisdiction whose finances can support a plain, speedy, and efficient remedy and one whose finances cannot, Puerto Rico is far beyond that line.

### 3.    Tax Credits Do Not Provide Wal-Mart PR With a "Plain, Speedy, and Efficient" Remedy

The Secretary proposes that, in place of a full *refund*, two different *credits* against Wal-Mart PR's future taxes constitute an adequate remedy. Opening Br.

26-27.  This argument fails as both a legal and a factual matter.  As a legal matter, the Secretary has presented no authority for the proposition that a credit against future taxes is an adequate remedy sufficient to oust the federal courts of jurisdiction.  The proposition should fail as a matter of law.  A credit against future taxes, by its nature, holds the taxpayer hostage to the jurisdiction that has just violated his federal rights.  If the taxpayer ceases to subject himself to that jurisdiction's taxes—either because he leaves the jurisdiction or because he goes out of business—then the credit becomes worthless, and is thus no remedy at all.  These concerns are not academic.  The enormous tax imposed on Wal-Mart PR may drive the company from the island long before any credit could be recouped.

However, this Court need not determine, as a legal matter, whether a credit against future taxes may ever constitute an adequate remedy sufficient to oust the federal courts of jurisdiction.  That is because, as a factual matter, the credits at issue here are far too limited and too "uncertain," *Rosewell,* 450 U.S. at 516-17, to constitute an adequate remedy.

### a.     The Overpayment Credit Is Inadequate

The District Court found that the overpayment credit would not be available for payments of a tax later struck down as unconstitutional, because such payments were not made "in excess of" the tax statutes that were in effect at that time.  *Supra* 16.  The District Court also found that the overpayment credit would be limited to

30

just $3 million per year, by the Fiscal Sustainability Act.  The Secretary does not dispute these findings in his brief, so any challenge has been waived.

The District Court further found that, even if the overpayment credit were available, it would only apply to the income tax liability that is "then enforceable" at the time that the refund is ordered.  *See supra* 16-17.  At that time, Wal-Mart PR's "regular" income tax liability is projected to be approximately $7 million.  Therefore, for the remainder of its $214 million "overpayment," Wal-Mart PR would be granted a "refund"—which, as noted, could only be paid at $3 million per year (at best) under the Fiscal Sustainability Act.

On this one factual finding—that the overpayment credit would only apply to tax liability "then enforceable"—the Secretary's brief disagrees with the District Court.  Opening Br. 27 n.7.  The Secretary cites testimony from his employee, Mr. Victor Pizarro, to the effect that the Treasury "can voluntarily apply the overpayment to the taxes for the following years."  *Id.*  This testimony, however, does not show that the District Court clearly erred.  Neither Mr. Pizarro nor the Secretary cites any statute or regulation that is contrary to the District Court's finding.  Nor do Mr. Pizarro or the Secretary point to any practice—not even a single example—in which a taxpayer was permitted to use an overpayment credit to offset future tax liability that was not "then enforceable" at the time the credit became available.  Therefore, significant uncertainty exists as to whether a future

Secretary, years from now, actually *would* "voluntarily apply the overpayment to the taxes for the following years," as Mr. Pizarro claims.

Even if the statute were clear that Wal-Mart PR were entitled to use an overpayment credit in every tax year, not just in the tax year "then enforceable," the overpayment credit would still be an inadequate remedy, because it would be limited to Wal-Mart PR's regular income tax liability. That liability is projected to be just $7 million per year. *Supra* 16. At that rate, it would take more than thirty years for Wal-Mart PR to obtain $214 million in credits, even if the Secretary's interpretation of the overpayment statute were correct (which it is not).

b.    The AMT Credit Is Inadequate

The AMT Credit is even more limited and uncertain than the overpayment credit. The AMT Credit is smaller—just 25% of the difference between the taxpayer's regular tax and "tentative minimum tax." *Supra* 17-18. At most, therefore, the AMT Credit would be worth just 25% of Wal-Mart PR's "regular" income tax in any future year—and even that amount would only be available if the Legislature were to eliminate the traditional measure of "tentative minimum tax." So long as that traditional measure remains on the books, Wal-Mart PR could not expect to receive much more than $1 million per year in AMT Credit. *Supra* 18 & n.8.

In addition to being small, the AMT Credit is uncertain. The credit could vanish if the Legislature amends the AMT statute. (If such an amendment were to cause Wal-Mart PR's tentative minimum tax to again exceed its regular tax, the AMT Credit would become unavailable. *Supra* 18.)

### 4. The Secretary Misreads *Rosewell*

The Secretary's primary argument is based on his misreading of *Rosewell v. LaSalle Nat. Bank*, 450 U.S. 503 (1981). According to the Secretary, *Rosewell* holds that a local remedy qualifies as "plain, speedy and efficient" so long as the remedy provides an adequate *procedure*, in which the taxpayer may "raise any and all constitutional objections to the tax" and then "obtain a full hearing and judicial determination." Opening Br. 24. All that matters, the Secretary argues, is that the taxpayer receives the necessary "procedural elements." *Id.* 31 (quoting *Rosewell*, 450 U.S. at 517).

The Secretary misreads *Rosewell*. Even assuming that *Rosewell* limits the inquiry to "procedural elements," there is no question that actually receiving a refund is one of the "elements" of a refund-request "procedure." That procedural element was present in *Rosewell*, where it was obvious to all concerned that the county government had the ability to pay a refund.[10] Therefore, *Rosewell* did not overrule *Stewart Dry Goods*, *Georgia Railroad*, and *Adams County*, which found

---

[10] The taxpayer had sought (and the county had paid) refunds of similar amounts during all three prior tax years. *Id.* at 507 n.5.

that federal jurisdiction was appropriate where the local refund-request procedures failed to provide the key "procedural element" of an actual refund. Far from overruling those earlier cases, *Rosewell* took care to reaffirm the principle that "uncertainty concerning a State's remedy may make it less than 'plain' . . . . [and] lift[] the bar to federal-court jurisdiction." 450 U.S. at 516-17.

*Rosewell* did not present a situation in which denying federal jurisdiction would effectively deny judicial review altogether. In *Rosewell*, the alleged flaw was that the taxpayer would not earn interest (on her refund claim of $6,106) during the two years her case was pending in the local courts. *Id.* at 506-07. There is no indication that the taxpayer in *Rosewell* (who owned a 22-unit apartment building) would go out of business if deprived of two years' interest on $6,106. *Rosewell*, therefore, does not overrule the Fifth Circuit's holding in *Denton*.

>5. <u>Federal Jurisdiction Is Mandated by the U.S. Constitution</u>

Even if the Butler Act could be read to prohibit federal jurisdiction here (and it cannot), that interpretation would violate the U.S. Constitution. The Constitution requires that an adequate remedy exist, in some forum, to correct the deprivation of a legal right. *See Marbury v. Madison*, 5 U.S. 137, 166 (1803). Therefore, though Congress generally has the power to restrict the jurisdiction of federal courts to hear state tax disputes, such a restriction violates the Constitution if it leaves the taxpayer with no forum at all. Henry M. Hart, Jr., *The Power of Congress to Limit*

34

*the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362, 1369 (1953) (taxpayer has constitutional right to "one bite at the apple," in some forum, to challenge unconstitutional state taxes); *id.* at 1369 n.32 (collecting Supreme Court decisions on this point); Martin A. Redish & Curtis E. Woods, *Congressional Power to Control the Jurisdiction of Lower Federal Courts: A Critical Review and A New Synthesis*, 124 U. Pa. L. Rev. 45, 93 n.218 (1975) (collecting federal court decisions locating this right in the Due Process Clause).

## II.    Comity Did Not Bar the District Court From Striking Down the Transfer-Based AMT

### A.    Standard of Review

Where a district court determines that comity does not require it to abstain from exercising jurisdiction, this Court will "review de novo the essentially legal determination of whether the requirements for abstention have been met." *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 516 (1st Cir. 2009). "Nonetheless, the district court's findings of fact and applications of law, as opposed to its ultimate legal conclusions, evoke a more deferential standard of review." *Id.*

### B.    Argument

The Secretary's comity argument fails for the reasons already discussed: Puerto Rico does not provide an adequate remedy.  No comity decision holds that a federal court must stand aside, and permit a violation of federal rights to go

unremedied, where a plaintiff has no adequate remedy available under local law. Just the opposite is true.

In its leading comity decision prior to the Tax Injunction Act, the Supreme Court made clear that federal courts should continue to assert jurisdiction "where it may be necessary to protect the rights of the citizen whose property is taxed, and he has no adequate remedy by the ordinary processes of the law." *Dows*, 78 U.S. at 110; *see also Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 299 (1943) (the "practice of federal equity courts" was to "refus[e] . . . to interfere with the collection of state taxes *unless* the threatened injury to the taxpayer is one for which the state courts afford no adequate remedy" (emphasis added)).  In its most recent comity decision, the Supreme Court reaffirmed that the comity doctrine is only applicable "*so long as* state courts are equipped fairly to adjudicate" the plaintiff's federal claims.  *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 428 (2010) (emphasis added).

The Supreme Court has also instructed that the legal standard for what constitutes an adequate state remedy, for purposes of the comity doctrine, is the same "plain, speedy, and efficient" standard that applies under the Tax Injunction Act.  *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 116 n.8 (1981) ("Numerous federal decisions have treated the adequacy of state remedies [under the TIA], and it is to that body of law that federal courts should look in

36

seeking to determine the occasions for the comity spoken of today."); *see also Coors Brewing Co. v. Mendez-Torres*, 678 F.3d 15, 28 (1st Cir. 2012) (citing and applying *Fair Assessment in Real Estate Association*'s test).

Here, for the reasons already stated, Puerto Rico's refund-request procedure does not provide Wal-Mart PR with an adequate remedy for the enormous tax at issue here. Therefore, the comity doctrine does not apply.

## III. The Transfer-Based AMT Violates the Dormant Commerce Clause, Federal Relations Act, and Equal Protection Clause

### A. *Standard of Review and Waiver*

Following a bench trial on constitutional claims, this Court will "review factual determinations . . . for clear error and afford plenary review to the trier's formulation and application of the law." *Wine And Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 4 (1st Cir. 2007).

For the first time, the Secretary defends Act 72 based on the legislative history and text of a different tax statute, Act 154. This argument was never presented to the District Court. *See* A740 (pre-trial order); A766 (Secretary's pre-trial brief). Nor was the text of Act 154, or its "statement of motives," which appear at pages 115-61 of the Addendum, ever presented to the District Court. The Secretary's arguments, which are based on these new materials, have been waived. *See Playboy Enterprises*, 906 F.2d at 40.

37

### B. The Transfer-Based AMT Violates the Dormant Commerce Clause

The Dormant Commerce Clause applies "with equal force" to Puerto Rico as it does to the states. *Trailer Marine Transp. Corp. v. Rivera Vázquez*, 977 F.2d 1, 8 (1st Cir. 1992). The Clause forbids Puerto Rico from "discriminat[ing] between transactions on the basis of some interstate element." *Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 332 (1977) (striking down tax on nonresidents' stock transfers). Puerto Rico "may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Armco Inc. v. Hardesty*, 467 U.S. 638, 642 (1984) (striking down a West Virginia tax that applied only to sales of tangible property that had been manufactured out-of-state). Nor may Puerto Rico "impose a tax which discriminates against interstate commerce . . . by subjecting interstate commerce to the burden of 'multiple taxation.'" *Comptroller of Treasury of Maryland v. Wynne*, 135 S. Ct. 1787, 1794 (2015) (striking down a Maryland tax on income earned out-of-state).

A statute violates the Dormant Commerce Clause if it "discriminates against interstate commerce on its face, in purpose, or in effect." *All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 35 (1st Cir. 2005). Here, the transfer-based AMT discriminates in all three ways. Because the tax discriminates against interstate commerce, it must "receive[] a form of strict scrutiny so rigorous that it is usually fatal. This amounts to a 'virtually *per se* invalid rule.'" *Id.* (quoting *Or. Waste*

*Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 99 (1994)). "The state bears the burden of showing legitimate local purposes and the lack of non-discriminatory alternatives, and discriminatory state laws rarely satisfy this exacting standard." *Family Winemakers of California v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010).

### 1. On Its Face, the AMT Discriminates Against Interstate Commerce

The District Court found that the transfer-based AMT, on its face, applies only to interstate commerce and interstate transactions. *Supra* 18-19. The Secretary does not dispute that factual finding on appeal, and conceded as much in his briefing below. *Supra* 18-19. The AMT's plain text makes clear that it is directed at interstate purchases of goods and services. This is one of the most facially discriminatory statutes that Professor Pomp had seen in his forty years of research. Addendum 85.

### 2. The AMT Discriminates in Effect

The transfer-based AMT has the effect of imposing a tariff on goods and services imported from an affiliated corporation located outside Puerto Rico. A "protective tariff" is "[t]he paradigmatic example of a law discriminating against interstate commerce." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994) (striking down tax on milk purchased out of state). "Tariffs against the products of other States are so patently unconstitutional that [the Supreme Court's cases] reveal not a single attempt by any State to enact one. Instead, the cases are filled

with state laws that," like the transfer-based AMT, "aspire to reap some of the benefits of tariffs by other means." *Id.*[11]

The transfer-based AMT's discriminatory, tariff-like effect is shown in three ways—first, by the disproportionate burden the AMT places on interstate transfers of goods and services; second, by the AMT's failure to comply with the Supreme Court's "internal consistency" test; and third, by the AMT's failure to comply with the Supreme Court's "external consistency" test.

a.    The AMT Imposes Disproportionate
Burdens on Out-of-State Interests

"A state law is discriminatory in effect when, in practice, it affects similarly situated entities in a market by imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests." *Family Winemakers*, 592 F.3d at 10-11 (striking down, as discriminatory in effect, a Massachusetts law restricting sales by "large" wineries (most of whom were out-of-state), but not "small" wineries). "State laws that alter conditions of competition to favor in-state

---

[11] *See, e.g., Boston Stock Exchange*, 429 U.S. 318 (striking down tax on nonresidents' stock transfers); *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331-33 (1996) (striking down North Carolina tax on stock owned in non-resident corporations); *Maryland v. Louisiana*, 451 U.S. 725, 801 (1981) (striking down a tax on imported natural gas); *Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388, 404-05 (1984) (striking down tax credit that effectively operated as a tax on imports); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984) (striking down excise tax exemption that applied only to local manufacturers, and not manufacturers in other states).

interests over out-of-state competitors in a market have long been subject to invalidation." *Id.*

The transfer-based AMT burdens out-of-state interests in two ways. First, as the Secretary conceded at trial, the AMT "treats some goods sold from outside Puerto Rico differently than goods sold within Puerto Rico," by making the transferred goods more expensive than local goods. *Supra* 19. Local goods and services are thus comparatively cheaper than imports from affiliated corporations. This is "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Family Winemakers*, 592 F.3d at 9.

Second, the transfer-based AMT burdens out-of-state interests because it makes doing business in Puerto Rico more expensive for multinational businesses that are based outside the Commonwealth. (Local businesses are not subject to the tax.) The Secretary's brief concedes that the Legislature "designed" the transfer-based tax "with multinational corporations (such as Wal-Mart PR) in mind." Opening Br. 39. The Secretary further concedes that Act 72 was intended to "raise revenue" from these corporations. *Id.* 40. The District Court found that the tax "is a legislative money grab pure and simple, funding the personal account of Puerto Rico's insolvent Treasury from the presumably deeper pockets of large multistate corporations and their local affiliates." Addendum 88. That "money grab" imposes a disproportionate burden on out-of-state interests.

b.     The AMT Fails the Internal Consistency
       Test

In addition to the AMT's disproportionate burden on interstate commerce, the law's discriminatory effect is also shown by its failure to comply with the "internal consistency" test.  The Supreme Court has frequently applied this test to determine whether state income taxes and gross-revenue taxes discriminate, in effect, against interstate commerce.  *See Wynne*, 135 S. Ct. 1787 (striking down a Maryland income tax that taxed residents' out-of-state income).  The "internal consistency" test "looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate."  *Id.*; *see also Am. Trucking Associations, Inc. v. Scheiner*, 483 U.S. 266, 284 (1987).

Here, the transfer-based AMT fails the "internal consistency" test because, if every state were to adopt this AMT,

> the flow of interstate commerce would no longer be free.  Instead, part of the flow would hit a speed bump each time it crossed state lines because of the disruptive interference of each jurisdiction's transfer-based AMT. And, by attacking only the business models of multistate corporations and conglomerates, the AMT would continually penalize those taxpayers for their functional integration, centralized management, and economies of scale, which normally are valued because they 'reduce costs' by 'eliminat[ing] duplication of effort and assets.'

Addendum 87 (quoting *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1335 (Fed. Cir. 2010)).  This result would "place interstate commerce at a disadvantage

42

as compared with commerce intrastate." *Wynne*, 135 S. Ct. at 1802. Therefore, the transfer-based AMT fails the internal consistency test.

        c.     The AMT Fails the External Consistency Test

Another test the Supreme Court has employed, to determine whether a state tax discriminates against interstate commerce by its effects, is the "external consistency" test. "External consistency . . . looks . . . to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185 (1995). A state tax violates the "external consistency" test if there is "no rational relationship between the income attributed to the State [by the state tax] and the intrastate values of the enterprise." *Amerada Hess Corp. v. Dir., Div. of Taxation, New Jersey Dep't of Treasury*, 490 U.S. 66, 74-75 (1989) (internal citations and quotation marks omitted). The Supreme Court has applied the "external consistency" test to strike down state taxes on revenues earned in other states.[12] Though the District Court did not apply this test below, Wal-Mart PR

---

[12] *Cent. Greyhound Lines of N. Y. v. Mealey*, 334 U.S. 653, 663 (1948) (striking down New York's tax on gross receipts that transportation companies earned in New Jersey because "an unapportioned gross receipts tax makes interstate transportation bear more than 'a fair share of the cost of the local government whose protection it enjoys'"); *Gwin, White & Prince v. Henneford*, 305 U.S. 434, 439 (1939) ("[S]tate taxation . . . is precluded if it . . . undertakes to lay a privilege

preserved the argument, and therefore the judgment may be affirmed on this basis. A792-94.

The transfer-based AMT fails the "external consistency" test because it "reaches beyond that portion of value that is fairly attributable to economic activity within" Puerto Rico, *Jefferson Lines,* 514 U.S. at 185, and places a tax on income that is properly attributable to Wal-Mart Stores, and not to Wal-Mart PR. The income of Wal-Mart *Stores*—the U.S.-based parent company, which is not a Puerto Rico taxpayer—has "no rational relationship . . . [to] the intrastate [i.e., on-island] values of the enterprise" of Wal-Mart PR. *Amerada Hess*, 490 U.S. at 75. This is demonstrated by the testimony and analysis of Wal-Mart PR's expert in transfer pricing, Perry Urken. Mr. Urken demonstrated that the AMT, if viewed as an adjustment to the prices of the inventory sold by Wal-Mart Stores to Wal-Mart PR, would have the effect of forcing Wal-Mart Stores to sell its goods to Wal-Mart PR at a loss. Addendum 42-43, 48-49. Meanwhile, Wal-Mart Stores must continue paying federal and state income tax based on the actual transfer prices charged. As the District Court concluded, "under the AMT, the risk of double taxation is omnipresent and cannot be offset." Addendum 47. This is powerful evidence that the transfer-based AMT is seizing income that is not "fairly attributable to economic activity within" Puerto Rico, but that is instead fairly

---

tax measured by gross receipts derived from activities in such commerce which extend beyond the territorial limits of the taxing state.").

attributable to the economic activity of Wal-Mart Stores, outside Puerto Rico. Therefore, the tax violates the "external consistency" test.

### 3. The AMT Discriminates in its Purpose

Where, as here, a statute "discriminates against out-of-state [interests] in its effects," that discriminatory effect "strengthens the inference that the statute was discriminatory by design. Less deference to legislative judgment is due where the local regulation bears disproportionately on out-of-state residents and businesses." *Family Winemakers*, 592 F.3d at 13-14 (internal citations and quotation marks omitted). In assessing the statute's purpose, this Court will look to "'the statute as a whole,' including statutory text, context, and legislative history," and will "also consider whether the statute was 'closely tailored to achieve the legislative purpose' the state asserted." *Id.*

Here, the Legislature's discriminatory purpose is clear regarding the amendments referred to by senior officials as "the Wal-Mart tax." *See supra* 4. As the Secretary admitted in his testimony, the purpose of Act 72 was to raise revenue for the Commonwealth from large interstate companies. *See supra* 5-6; A1433. Act 72 was "a legislative money grab" that targeted "the presumably deeper pockets of large multistate corporations and their local affiliates." Addendum 88.

The second part of this Court's "methodology" in assessing legislative purpose is to "consider whether the statute was 'closely tailored to achieve the

legislative purpose' the state asserted." *Family Winemakers*, 592 F.3d at 13-14.

Where there is a "disparity between a law's asserted ends and its means," that

disparity is "somewhat suspect" because it "evidence[s] a likely discriminatory

purpose." *Id.* at 15.   In this case, there is an enormous "disparity" between the

purposes the Secretary now asserts, and the means chosen by the Legislature.

On appeal, the Secretary's lawyers now argue that the purpose of Act 72 was "to serve as a proxy for the tax that would be imposed upon profits that are shifted to related parties." Opening Br. 39-40.  That argument is contradicted by the plain text of the statute, which applies to the gross value of *any* transferred goods and services, regardless of whether any "profits" are "shifted."    The Secretary's argument is also contradicted by his own testimony, in which he admitted that Treasury does not even *suspect* that Wal-Mart Stores or Wal-Mart PR—the largest payer of the "Wal-Mart tax," and the only taxpayer in the highest bracket—has improperly set its transfer prices.  Addendum 34; A1422-23; A1445.  The "ends" now asserted, and the "means" actually chosen by the Legislature, are not merely "dispar[ate]," *Family Winemakers*, 592 F.3d at 15, they are poles apart.  The purpose of Act 72 was to discriminate against interstate commerce and interstate companies.

4.     The AMT Is Not "Compensatory"

The Secretary claims that the transfer-based AMT is a "'compensatory tax' designed simply to make interstate commerce bear a burden already borne by intrastate commerce." Opening Br. 39 (quoting *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 647 (1994)).  The Secretary's argument appears to be that the AMT is a "compensatory tax" that serves as a substitute for the Puerto Rican income tax that would be paid by the transferring company, if that company were subject to Puerto Rico's income tax.  *Id.* 39; *see* Bittker on Regulation, *Interstate & Foreign Commerce,* "Compensatory" Taxes § 8.06 (West 2016).   The "compensatory tax" doctrine is narrow.   The Supreme Court has "seldom recognized a valid compensatory tax outside the context of sales and use taxes."  *Id.* n.77 (quoting *Fulton Corp. v. Faulkner,* 516 U.S. 325, 342 (1996)).  A "use" tax, when applied to an item purchased out-of-state and then imported to be used in the state, is "compensatory" so long as it is functionally identical to the "sales" tax that would have been paid if the same item had been purchased in the state.  *Id.*

Three elements must be present in order for a tax to be deemed "compensatory."  *See Oregon Waste Systems*, 511 U.S. at 103 (rejecting argument that Oregon's surcharge on out-of-state waste was "compensatory").  Here, the Secretary has not established any these three elements.  Specifically, the Secretary (1) has not identified the existing intrastate tax burden on Puerto Rican taxpayers,

47

for which the transfer-based AMT is purportedly compensating; (2) has not shown that the AMT is roughly approximate (but does not exceed) the amount of that existing intrastate tax; and (3) has not shown that the events on which the interstate and intrastate taxes are imposed are "substantially equivalent."  *See id.*; *see also* A1069-72 (Professor Pomp testimony describing why the transfer-based AMT does not qualify as "compensatory").

5.   The Secretary's "Captive Market" Argument Fails

The Secretary argues that, because the transfer-based AMT targets only intercompany transfers, the tax is immune from the Dormant Commerce Clause, since intercompany transfers are "captive transactions for which there is no economic 'market.'"  Opening Br. 42.

The Secretary cites no authority for his creative "captive market" theory. The theory is contrary to numerous decisions by the Supreme Court, which hold that it is the effect of the discriminatory tax that matters, not the tax's technical form.  *See, e.g., Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388, 405 (1984) ("declin[ing] to attach any constitutional significance to . . . formal distinctions that lack economic substance").  The "captive market" theory is also contrary to the Supreme Court's long history of applying the "strictest scrutiny" to laws that discriminate against interstate commerce.  *Oregon Waste Sys., Inc.,* 511 U.S. at 100-01.

48

The Supreme Court rejected a similar theory in *Boston Stock Exchange*. 429 U.S. at 333. In that case, New York defended its tax (on nonresidents' sales of stock) by pointing out that this tax discriminated against only *some kinds* of interstate commerce (namely, nonresidents' out-of-state sales). *Other kinds* of interstate commerce (namely, nonresidents' sales within New York) were not taxed. *Id.* The question, therefore, was "whether a State may tax in a manner that discriminates between two types of interstate transactions in order to favor local commercial interests over out-of-state businesses." *Id.* at 335. The answer, the Court held, was that "such discrimination is constitutionally impermissible." *Id.* Here, it is impermissible for Puerto Rico to discriminate against so-called "captive" transfers of goods to the island. The fact that the transfer-based AMT does not also discriminate against "non-captive" transfers does not excuse the AMT's discrimination against "captive" interstate transfers.

### 6. The AMT Cannot Withstand Strict Scrutiny

Because the AMT "discriminates against interstate commerce on its face, in purpose, [and] in effect," the law "receives a form of strict scrutiny so rigorous that it is usually fatal. This amounts to a 'virtually *per se* invalid rule.'" *All. of Auto. Mfrs.*, 430 F.3d at 35. Under this test, the statute is "invalid unless it advances a legitimate local purpose that cannot be served by reasonable non-discriminatory means." *Id.*

The Secretary's brief claims that the AMT's legitimate purpose is to prevent "[tax] base erosion and profit shifting," or, put another way, to prevent the "leakage of income outside of the Commonwealth's taxing jurisdiction." Opening Br. 42.

These justifications are, the District Court concluded, "utterly belied by the record." Addendum 88. The transfer-based AMT is not a "proxy" for shifted profits. The tax would apply to these transfers regardless of whether any "profits" were being "shifted" to another jurisdiction. Indeed, as the District Court found, the tax "applies to a transaction regardless of whether the transfer price is appropriate," and would even apply if Wal-Mart Stores were "shifting" its profits "*to the island*," thereby increasing Wal-Mart PR's income and its "regular" income tax. Addendum 88.

Even if Act 72 were intended to prevent "base erosion and profit shifting" (it was not) the tax would still fail to meet strict scrutiny because there are non-discriminatory ways to accomplish this goal. The Secretary himself conceded that Act 72 is "not the narrowest or most targeted way that Puerto Rico could address transfer pricing abuse if it wished to." Addendum 33 (quoting A1432-33). More targeted ways of addressing this problem include: enforcing the transfer-pricing regulations currently on the books; seeking assistance from the IRS under the Tax Coordination Agreement; and joining the Multi-State Tax Commission.

50

Addendum 91.  Act 72 is not narrowly targeted and therefore does not satisfy strict scrutiny.

### C.    The Transfer-Based AMT Violates the Federal Relations Act

This Court interprets the Federal Relations Act, 48 U.S.C. § 741a, much like the Dormant Commerce Clause.  The focus of the Act is on the practical effects of the tax, rather than its technical form.  *See San Juan Trading Co. v. Sancho*, 114 F.2d 969, 974 (1st Cir. 1940) (considering the tax's "avowed intent and necessary effect" to find that the tax discriminated against imported matches and in favor of locally produced matches).  Here, the District Court found, the "practical effect" of the transfer-based AMT is "the economic protection of goods produced or manufactured locally."   Addendum 94.   The Secretary conceded, during his testimony at trial, that the transfer-based AMT "treats articles manufactured in Puerto Rico differently than it treats some articles manufactured off the island." A1432.  For these reasons, and for all the reasons stated *supra* 37-51, the transfer-based AMT violates the Federal Relations Act.

### D.    The Transfer-Based AMT Violates the Equal Protection Clause

"[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even [the] most deferential standard of review."  *Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988).  Providing "a shield against arbitrary classifications" is the "core concern" of the Equal Protection Clause.  *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008).

The District Court held that the transfer-based AMT violates the Equal Protection Clause "because it is both arbitrary in its discrimination and not rationally connected to a legitimate government purpose."   Addendum 96. Specifically, it arbitrarily and irrationally discriminates against interstate transfers from related parties (which are taxed) but not against transfers from unrelated parties (which are not taxed).

Singling out interstate transfers from related parties might make sense *if* the tax's purpose were to combat profit shifting, *and if* the tax were narrowly targeted to achieve this purpose.  *Id.*  The purpose of the transfer-based AMT, however, has nothing to do with profit shifting—this tax is simply a revenue-raising measure. *Id.*; *see supra* 4-5.  Indeed, the Legislature singled out Wal-Mart PR for the highest bracket, and to bear one-fifth of the entire AMT collection, despite the fact that the Treasury did not believe Wal-Mart PR was improperly manipulating its transfer prices.  Addendum 43.

Because the transfer-based AMT's purpose is to generate revenue, not to prevent transfer-pricing abuse, the tax's discrimination against related-party transfers (but not against unrelated-party transfers) is "wholly arbitrary." *Williams v. Vermont*, 472 U.S. 14, 22, 23-24 (1985) (Vermont violated Equal Protection Clause by providing a tax credit to Vermont residents who paid out-of-state sales tax, while denying the same credit to non-residents who paid the same tax).  Here,

52

as in *Williams*, the real purpose of the transfer-based AMT (raising revenue) "would be identically served, and with an identical burden, by taxing" both related-party transfers and unrelated-party transfers. *Id.* at 23. By making a "wholly arbitrary" distinction between related-party transfers and unrelated-party transfers, the transfer-based AMT violates the Equal Protection Clause. *Id.*

## IV. The District Court Did Not Abuse Its Discretion by Setting an Expedited Discovery Schedule on the Merits and By Denying the Secretary's Requested Discovery

### A. *Standard of Review and Waiver*

Below, the Secretary never asked the District Court for additional time for *jurisdictional* discovery. *Supra* 10. Therefore, any challenge to the schedule for *jurisdictional* discovery is waived. *Playboy Enterprises,* 906 F.2d at 40. The only question is whether the District Court abused its discretion by ordering expedited *merits* discovery.

This Court reviews the District Court's order setting an expedited discovery schedule "for abuse of discretion, as it is the province of the district court to manage its docket, and, within that province, to decide what constitutes a reasonable period of time for preparation." *United States v. Romero-Lopez*, 695 F.3d 17, 21 (1st Cir. 2012) (internal quotation marks omitted). In order to show that the expedited schedule was an abuse of discretion, the Secretary must articulate some reason why additional time would have made a "significant difference" to the outcome of the merits of this case. *Id.* at 22; *see also United*

53

*States v. Flecha-Maldonado*, 373 F.3d 170, 176 (1st Cir. 2004) (no abuse of discretion in setting "unusual trial schedule" where defendant could not identify any "concrete ways" in which that schedule "prejudiced" him).

This Court also reviews the District Court's denial of the Secretary's requested additional merits discovery for abuse of discretion. A "trial judge has broad discretion in ruling on pre-trial management matters, and we review the district court's denial of discovery for abuse of its considerable discretion." *Braga v. Hodgson*, 605 F.3d 58, 59 (1st Cir. 2010).

> B.   Argument

> > 1.   <u>The Expedited Merits Schedule Was Not an Abuse of Discretion</u>

It is standard practice, where the facts relevant to jurisdiction are "inextricably intertwined with the merits of the case," for a district court to "defer its jurisdictional decision until the merits are heard." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992). The Secretary has given no reason why it was inappropriate for the District Court to follow that practice here.

In expediting merits discovery, the District Court invoked Federal Rule of Civil Procedure 57, which provides: "The court may order a speedy hearing of a declaratory-judgment action." *See* A337. The Secretary has not identified any additional, *relevant* merits discovery that he was unable to obtain because of the "speedy hearing" on the merits.

54

The Secretary also failed to give the District Court any specific reason why more time was necessary for merits discovery. *See* A321-36 (Secretary's January 7 motion). At the close of Wal-Mart PR's evidence, the Secretary told the District Court he was ready to proceed with presenting his own evidence. A1524-26. He did not renew his request for more time or identify any evidence he had been unable to obtain. *See Id.* At no point did the Secretary request a continuance.

The District Court did not abuse its discretion by setting an expedited schedule for a combined hearing on the merits and jurisdiction, and the Secretary has not shown that more time would have made a "significant difference" to the outcome. *Romero-Lopez*, 695 F.3d at 21.

2. <u>Denying the Secretary's Irrelevant Additional Merits Discovery Requests Was Not an Abuse of Discretion</u>

The Secretary complains that the District Court "denied" his "requests for discovery on issues related to base erosion and transfer pricing." Opening Br. 19. Those discovery requests, however, were irrelevant to the merits. They were directed at Wal-Mart PR's and Wal-Mart Stores' individual methods for calculating transfer prices. *See* A219-23 (Secretary's portion of "Joint Discovery Plan" describing "Secretary's Discovery"). Such requests, the District Court found, "did not make sense" in "a federal-court challenge to the tax as illegal on its face." Addendum 68 n.22.

55

In his brief, the Secretary claims that denying his merits discovery was unfair because Wal-Mart PR was "allowed to devote a great amount of time to the issue of transfer pricing to prove discriminatory intent." Opening Br. 21. This argument fails, however, because the Secretary's discovery requests were not related to the intent of the legislature or to the effects of the transfer-based AMT on other taxpayers, *see* A219-23, and because the Secretary himself conceded he had no reason to suspect Wal-Mart Stores or Wal-Mart PR of manipulating its transfer prices. Addendum 43.

The Secretary fails to explain why the discovery granted by the District Court was inadequate. *See supra* 8-9. The District Court permitted broad discovery into Wal-Mart PR's background, finances, organizational structure, and transactions with Wal-Mart Stores, and the Secretary never moved to compel additional discovery. *See id.*

## V.     Wal-Mart PR Has Standing, and the Case Is Ripe

### A.     *Standard of Review*

Whether Wal-Mart PR has standing is "a legal question and, therefore, engenders de novo review." *Maine People's All. And Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 283 (1st Cir. 2006). Because the District Court's "standing determination rests on findings of fact," this Court will "honor those factual findings unless they are clearly erroneous." *Id.*

B. *Wal-Mart Has Standing*

Wal-Mart PR has standing to challenge the transfer-based AMT because: [1] Wal-Mart PR "has suffered an injury in fact"; [2] "this injury was caused by the conduct complained of," and [3] "the relief sought is likely to redress the injury suffered." *Van Wagner Boston, LLC v. Davey*, 770 F.3d 33, 36 (1st Cir. 2014).

Wal-Mart PR's injury-in-fact is the payment of estimated taxes, both during the fiscal year ending January 31, 2016, and (if not enjoined) in the future. This injury-in-fact is caused by the transfer-based AMT, which is included in the estimated tax payments. *Supra* 7-8. These estimated tax payments are required by Puerto Rican law, and Wal-Mart PR would be penalized if it did not make them. Addendum 50 n.14. At the December 23 preliminary hearing, counsel for the Secretary described Wal-Mart PR's estimated tax payments as "tax money" that the Treasury was "entitled to receive according to the law." A160-61. The relief Wal-Mart PR obtained below (a permanent injunction against the transfer-based AMT) has redressed its injury-in-fact.

C. *This Case is Ripe*

The Secretary also argues that the case was not "ripe" because Wal-Mart PR had not yet filed its tax return. Opening Br. 15-17. "There are two factors to consider in determining ripeness: [1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." *Roman*

*Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013). The Secretary does not dispute that [2] "withholding court consideration" would cause a "hardship" to the parties. Instead, the Secretary argues that [1] the issues are not yet "fit" for judicial decision because Wal-Mart PR has not yet filed its tax return for the year ending January 31, 2016. "The 'fitness' inquiry concerns questions of finality, definiteness, and the need for further factual development." *Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322*, 651 F.3d 176, 188 (1st Cir. 2011).

The Secretary speculates: "Act 72 may be wholly irrelevant to Wal-Mart PR's ultimate income tax liability." Opening Br. 16-17. This speculation was never raised below and is contradicted by every piece of evidence presented, and every argument made, at the evidentiary hearing. The District Court found that Wal-Mart PR would in fact owe approximately $30.9 million of transfer-based AMT for the tax year ending January 31, 2016. *Supra* 6-7. That finding was based on detailed and uncontroverted testimony from Wal-Mart PR's Senior Tax Manager, Mr. Echevarria. A866-67. No one in the courtroom—least of all the Secretary himself—ever disputed that Wal-Mart PR owed a significant amount of tax under the transfer-based AMT. Indeed, that was the whole point of Act 72, "the Wal-Mart tax." Act 72's purpose, in increasing the rate of the transfer-based

58

AMT, was to raise additional revenue from Wal-Mart PR and other interstate companies. *Supra* 4-5.

The Secretary quibbles that the *exact amount* of Wal-Mart PR's tax liability might turn out to be slightly different from the $30.9 million estimate that Mr. Echevarria provided. However, the *exact amount* of Wal-Mart PR's tax liability in Fiscal Year 2016 is irrelevant. Wal-Mart PR seeks only prospective relief—an injunction against future collections of this tax, and a declaratory judgment that the tax is unlawful. That prospective relief does not depend on the exact amount of tax due or paid in earlier periods.

This case requires no "further factual development," and is therefore "ripe" for decision. *Verizon New England*, 651 F.3d at 188.

## CONCLUSION

The judgment of the District Court should be affirmed.

DATED:  May 17, 2016                          Respectfully submitted,

                                              By:  */s/ Neal S. Manne*
                                              Neal Manne (Bar No. 1118172)
                                              Joseph S. Grinstein (Bar No. 1118171)
                                              SUSMAN GODFREY LLP
                                              1000 Louisiana Street, Suite 5100
                                              Houston, Texas 77002
                                              Telephone:  (713) 651-9366
                                              Facsimile:  (713) 654-6666
                                              nmanne@susmangodfrey.com
                                              jgrinstein@susmangodfrey.com

Shawn Rabin (Bar No. 97177)
Steven M. Shepard (Bar No. 1174473)
SUSMAN GODFREY LLP
560 Lexington Avenue, Fifteenth Floor
New York, New York 10022‑6828
Telephone: (212) 336‑8330
Facsimile: (212) 336‑8340
srabin@susmangodfrey.com
sshepard@susmangodfrey.com

Juan A. Marqués-Díaz (Bar No. 17203)
Francisco G. Bruno (Bar No. 41059)
Alejandro J. Cepeda-Diaz (Bar No. 1134276)
McCONNELL VALDÉS LLC
P.O. Box 364225
San Juan, Puerto Rico 00936-4225
Telephone: (787) 250-2619/5608
Fax: (787) 759-2772/620-8325
jam@mcvpr.com
fgb@mcvpr.com
ajc@mcvpr.com

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

The undersigned certifies that the foregoing Brief is in compliance with Rule 32(a)(7)(B), and contains 13,925 words, excluding the parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman in 14 point size.

<u>*/s/ Neal S. Manne*</u>
Neal S. Manne

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing instrument has

been served on all counsel of record via the Electronic Case Filing (CM/ECF)

system in the First Circuit Court of Appeals, this 17th day of May, 2016.

*/s/ Neal S. Manne*
Neal S. Manne